IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 20, 2019

**STATE OF TENNESSEE v. TERRY D. WINTERS**

**Appeal from the Criminal Court for Davidson County**
**No. 2016-B-714      J. Randall Wyatt, Jr., Judge[1]**

_____

**No. M2017-01155-CCA-R3-CD**

_____

The defendant, Terry D. Winters, was indicted for and convicted of aggravated kidnapping, aggravated assault, and domestic assault for which he received an effective twenty-year sentence. He now appeals the denial of his motion for new trial wherein he alleged he received ineffective assistance of counsel and challenged a statement made during the State's closing argument. Following our review, we affirm the denial of the motion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Michael L. Freeman, Nashville, Tennessee, for the appellant, Terry Dewayne Winters.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Amy Hunter and Jeffrey Jackson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

I.    Trial

---

[1] Judge J. Randall Wyatt, Jr. presided over the defendant's trial and sentencing hearing. However, Judge Wyatt retired prior to the hearing on the defendant's motion for new trial. Judge Angelita Blackshear presided over the defendant's motion for new trial in accordance with Tenn. R. Crim. P. 25(b).

This case arises from an incident occurring between the defendant and the victim at a motel room in Davidson County, Tennessee. For his actions, the defendant was charged with aggravated kidnapping, aggravated assault, and domestic assault. Tenn. Code Ann. §§ 39-13-102; -111; -304. After initial counsel withdrew and the trial court appointed subsequent counsel, the defendant proceeded to trial on March 6, 2017. The State presented the following facts for the jury's review.

Cynthia Johnson, the defendant's fiancée and victim, testified she had been in an "on and off" relationship with the defendant for approximately eight or nine years. In 2016, the victim had recently been diagnosed with COPD and required oxygen.[2] She did not live with the defendant but saw him one to three times per week typically at a friend's or his family's house or a motel. The victim also served as the defendant's means of transportation, as he did not have a car.

On February 2, 2016, the defendant bought new tires for the victim's car before they rented a motel room. After spending time together in the room, the victim went to sleep around 10:00 or 11:00 p.m. while the defendant watched television. Hours later, at approximately 2:30 or 3:00 a.m., the defendant tried to wake the victim in order to have sex. The victim ignored his advances, but the defendant got "louder and louder." The defendant began to insult the victim so she "jumped up out of the bed and got [her] purse" in an effort to leave the room. The defendant "got in front of the door" and told the victim she "was going to stay there . . . or take him home." The victim, however, did not want to drive the defendant home because she was upset and "just wanted to go home [herself]." As she reached for the doorknob, the defendant began "wrestling" with her. The two pushed each other and "ended up on the ground" for approximately two or three minutes, three separate times. Each time they fell to the ground, the defendant landed on top of the victim and she was unable to move. The defendant would eventually help her up, and the victim would try to exit the room which "just started it all over again."

During the episode, the victim was scared the defendant "wasn't going to let [her] out" of the room, so she began "yelling for help," "banging on walls," and "screaming trying to get out." At one point, the defendant "put his hand over [the victim's] nose and [] mouth," causing her to lose her breath. The defendant stated, "I'm going to take you out" and that he "didn't care about [the victim's] air." The victim was unable to breathe and told the defendant she "needed to go outside to get some air." At trial, the victim explained she did not believe the defendant intended to obstruct her airway but admitted he did hinder her ability to breathe throughout the struggle, and he knew she suffered from a lung condition that caused her to "lose [her] breath real easy."

---

[2] "COPD" is an abbreviation for chronic obstructive pulmonary disease.

At the conclusion of the struggle, which lasted approximately one and a half hours, the victim was "still screaming." She reached for the telephone in the room, but the defendant blocked her and told her to "[s]it down until I get my clothes on." The victim complied and waited for the defendant to dress as he expected her to drive him home. She still did not want to drive the defendant home, explaining "at that point [I] didn't want to be in that predicament again, so . . . when he finally opened the door I pushed my alarm on my car, that is the only thing I could think to do." The victim's car was parked in front of the motel room, and as the alarm went off, she exited the room and began "banging on people's doors and windows." The defendant followed behind the victim, but he did not restrain her. The victim saw a car belonging to her friend, Lashanda Bloodworth, and began yelling "Randy," Ms. Bloodworth's fiancé's name. Ms. Bloodworth and her fiancé heard the victim and let her in their room where the victim called 9-1-1 at approximately 4:00 or 4:30 a.m. The victim was "terrified" and "just afraid [the defendant] was going to get in and do more, you know, he was going to get, he was going to come get me." A recording of the 9-1-1 call was played for the jury. During the call, the victim stated she feared the defendant was going to smother her to death and kill her. At trial, the victim again explained that at the time of the incident she was scared and was unsure what the defendant might do to her.

Officer Blake Giles of the Metropolitan Nashville Police Department arrived and photographed the victim's injuries. The next day, the victim went to the hospital, and her cousin took photographs of additional bruises that "popped up" overnight. The photographs depicting the victim's injuries were entered into evidence and showed bruising to her cheek, neck, face, breasts, arms, forearm, right wrist, and underneath her arms. One photograph also showed a cut on the victim's cheek and another showed the defendant's fingerprint under her left ear.

The victim explained she still cared for the defendant and spoke to him on a regular basis including the night before trial. In communicating with the defendant prior to trial, the victim acknowledged he "sometimes" encouraged her not to cooperate with the police or the district attorney's office. She admitted she did not want to proceed with the case against the defendant, noting they "both want him to get out."

During cross-examination, the victim expressed her belief that she did not think the defendant was trying to keep her in the motel room against her will. She stated the defendant might have just left the room "if [she] would have just sat down and hushed," but again noted at the time she was "terrified." The victim also stated the defendant had previously been diagnosed with bipolar disorder for which he was on medication and was to avoid alcohol. According to the victim, the defendant "was drinking" prior to the incident and had not taken his medication. The victim stated, "[w]hen [the defendant] is drinking he just goes berserk and he just I don't think understands what he is doing

- 3 -

hisself (sic)." The victim did not believe the defendant kidnapped her on February 2, 2016. She clarified some of her bruises resulted from the defendant trying to stop her from falling[3] and explained the defendant covered her mouth and nose during the struggle to prevent her from screaming. At the conclusion of her testimony, the victim admitted she still feared the defendant.

Officer Giles responded to the motel after the victim and an anonymous caller dialed 9-1-1. He spoke with the victim and arrested the defendant at the scene. Officer Giles described the victim as "[v]ery upset, very distraught and emotionally kind of just anxious, nervous, scared." He completed a domestic violence supplemental form which included a statement from the victim and documented her physical and emotional condition. A copy of the form was entered into evidence and detailed injuries to the victim's arms and chest, including bruises, scratches, and cuts. Additional photographs of the victim's injuries were also entered into evidence.

The victim's friend, Lashanda Bloodworth, testified she and her fiancé were staying at the same motel as the victim and the defendant on February 2, 2016. At approximately 4:00 a.m., Ms. Bloodworth woke up to a car alarm and the victim banging on doors and yelling her name. She assumed the victim saw her car parked in front of the motel and called her name as a result. Ms. Bloodworth and her fiancé allowed the victim to enter their room where the victim called 9-1-1. Ms. Bloodworth's fiancé stood outside their room until the police arrived. Inside the room, the victim was "upset, crying, [and] nervous." She told Ms. Bloodworth the defendant "had hit her" and the victim "had bruising all over her chest area."

After the State rested its case, the trial court denied the defendant's motion for judgment of acquittal. The defendant waived his right to testify and did not put on any additional proof. The jury convicted the defendant as charged on all counts, and the trial court immediately proceeded with a bifurcated hearing on count 3 in order to determine the number of prior domestic assault offenses the defendant had committed. During the hearing, the defendant pled guilty to domestic assault, third offense. At a subsequent sentencing hearing, the trial court imposed concurrent sentences of 20 years for aggravated kidnapping, 10 years for aggravated assault, and 90 days for domestic assault, third offense.

II. *Motion for New Trial Hearing*

On June 5, 2017, trial counsel filed a premature notice of appeal which was stayed by this Court. By June 16, 2017, new counsel began representing the defendant and a

_____

[3]The victim made this comment in a notarized statement dated July 28, 2016, after seeing the defendant in jail earlier that month.

timely motion for new trial was filed and later amended.[4] In the amended motion, the defendant alleged numerous reasons as to why he received ineffective assistance of counsel at trial, including that trial counsel failed to: prepare him for trial; "put forth any defense or attempt to mitigate any evidence brought by the [S]tate;" "properly interview any witnesses;" request a bench trial; pursue a "mental health" defense by not investigating or "presenting evidence of [the defendant's] mental deficiencies at trial;" "request to have the defendant examined in order to determine if he was mentally able to appreciate the nature of the charges against him and whether the defendant was able to assist in his defense either at trial or leading up to trial;" "explore other possible defenses;" request funds for and obtain expert witnesses; cross-examine Ms. Bloodworth; "investigate [the] [d]efendant's drug and alcohol history;" interview the defendant's brother; "put forth expert testimony as to the [d]efendant's state of mind when he consumed alcohol;" "put forth a defense of intoxication as to the charge of aggravated kidnapping;" request a jury instruction "providing that kidnapping is a specific intent crime;" "offer any assistance to the [d]efendant at all," barring two objections.

Separately, the defendant also challenged a statement made during the State's closing argument. According to the defendant, the State mischaracterized Ms. Bloodworth's testimony "when [it] stated to the jury that Ms. Bloodworth testified that the victim was 'terrorized' by the actions of the defendant." The defendant asserted the mischaracterization inflamed the jury and warranted a new trial because the State "overstepped the bounds of what the record reflected was testified to at trial and inserted their own opinion of what the testimony might have stated."

On February 23, 2018, the trial court conducted a hearing on the defendant's motion for new trial during which both the defendant and trial counsel testified. Based upon the substance of the motion, the trial court began the hearing by questioning the defendant's understanding of the effect the motion would have on his ability to present future post-conviction claims. The defendant stated he understood his apparent waiver of his potential post-conviction claims, noting he filed the motion because trial counsel failed to do "certain things" on his behalf. Motion for new trial counsel also detailed his strategy in focusing primarily on ineffective assistance claims in the motion, stating "I think it is obvious, Your Honor, this is my strategy. After reviewing the record in this matter this seemed like the most logical way to proceed. There was, there wasn't a lot in the trial itself in the record that presented any other option." The trial court then proceeded with the hearing.[5]

---

[4]The record does not make clear when trial counsel withdrew or when motion for new trial counsel began to represent the defendant.

[5]The defendant also waived his attorney-client privilege with trial counsel.

The defendant stated trial counsel was appointed to his case a couple of months prior to trial. According to the defendant, he spoke with trial counsel once on the telephone and met with trial counsel during scheduled court appearances, but they did not discuss trial strategies or possible defenses. During the conversations, trial counsel asked the defendant about potential witnesses for the defense, and the defendant listed "my girlfriend['s] friend and my girlfriend and the police . . . officer." However, the defendant claimed trial counsel did not do anything concerning the witnesses. The defendant also expressed to trial counsel his wish to have a bench trial, but trial counsel indicated "the D.A. is not going to give me no bench trial." The defendant stated he did not speak with trial counsel during the breaks throughout trial, indicating neither he nor trial counsel made an effort to do so.

Prior to trial, the defendant told trial counsel he suffered from mental health issues. The defendant stated he "was going to Mental Health Co-op" and was prescribed Depakote. Trial counsel, however, did not request copies of the defendant's mental health records or ask how long the defendant suffered from mental health issues. The defendant stated he did not disclose his history of drug and alcohol abuse to trial counsel.

During cross-examination, the defendant stated he was represented by the Public Defender's office at his arraignment on May 25, 2016. After being arraigned, the defendant asked the trial court "to get [him] another one," and trial counsel was appointed on November 2, 2016. The defendant admitted he met with trial counsel four times prior to trial on December 6, 2016, December 7, 2016, December 14, 2016, and March 1, 2017, before trial began on March 6, 2017. The defendant testified he told trial counsel he was drinking on February 2, 2016, but admitted trial counsel would not have known about his mental health issues absent his disclosure of the same.

Additionally, the defendant acknowledged he met with trial counsel's investigator, Debra Humphrey, "four or five times" while in jail. She provided discovery to the defendant, including several witnesses' recorded interviews and the defendant's recorded telephone calls made while in jail. As such, the defendant admitted he discussed the discovery with his defense team. During a meeting with Ms. Humphrey, the defendant asked when trial counsel would meet with him "because I am trying to get a bench trial going in front of the [j]udge." Ms. Humphrey, however, told the defendant a bench trial was not an option. The defendant also acknowledged he did not know what a bench trial entailed, believing it to be associated with sentencing issues rather than guilt or innocence. The defendant stated he chose not to testify at trial.

Regarding his convictions, the defendant admitted the victim and Ms. Bloodworth's testimony was hard to overcome but asserted, "I didn't do no kidnapping. [The victim] came and got me." The defendant explained:

I had been drinking a few beers and it started off with my brother and then, uh, I got some more at the store that I drunk and me and [the victim] got to arguing so I told her to take me home, so she told me, no, so I told her you came and got me will you please take me home, so I jumped in front of her and asked again and I moved out of the way and let her go and when we got arguing we got to pushing and shoving. She got to screaming. That is when I had put my hand over her mouth to try to keep her from screaming because I didn't want the police to come, then I was on paper so I just went on and let her go and she ended up calling the police.

During re-direct examination, the defendant again stated he wanted to have a bench trial and admitted he discussed trial strategy with trial counsel "[w]hen he first . . . picked the case up." The defendant acknowledged he met with Ms. Humphrey, but explained he did not believe those meetings were as beneficial as meeting with trial counsel would have been. The defendant did not remember discussing his decision to testify or not testify with trial counsel.

The defendant also stated he suffered from PTSD but could not explain the events leading to his diagnosis. At the time of the incident, he was taking two medications, Depakote and another that he could not recall. The defendant told trial counsel about his medications, but trial counsel did not ask the defendant what the prescriptions were treating. The defendant admitted he did not take his medication on the date of his crimes. The defendant again stated he told trial counsel about his mental health issues which trial counsel "didn't do nothing about," and his issues with drugs and alcohol abuse. However, the defendant specified his defense did not rely on his mental health condition. Rather, his defense was that he did not commit the crimes for which he was charged. Though the defendant stated he experienced moments of confusion during the hearing, he knew he was seeking a new trial.

Trial counsel testified that he and the defendant "communicat[ed] primarily through Ms. Humphrey" while the defendant was in jail. However, during his first meeting with the defendant, the defendant made clear what their defense strategy would be: that he did not commit a kidnapping and "no jury in their right mind would ever find him guilty of kidnapping." In response to this strategy, trial counsel explained "how conservative Tennessee's kidnapping law was," but the defendant "just kept repeating . . . I didn't kidnap nobody and nobody is going to find me guilty of kidnapping." Further, the defendant assured trial counsel the victim "[wa]s not coming to court" to testify against him. By their second meeting, however, trial counsel had reviewed the victim's preliminary hearing testimony and learned the victim would testify against the defendant at trial. When trial counsel told the defendant the victim intended to testify against him,

the defendant stated the District Attorney's office intimidated the victim into doing so. Regardless, the defendant "was adamant that he had no fear going to trial that everything was going to work out in his favor and nobody is going to convict him of kidnapping and that [the victim] was going to get up there and say it didn't really happen this way." Trial counsel disagreed and stated prior to trial he "came as close to begging a client as I ever have in my life" for the defendant to take the State's offer to "plead to aggravated assault, dismiss the kidnapping, [and] take six years and a month." The defendant, however, "absolutely would not consider it" as the defendant insisted he did not kidnap the victim.

As a result, trial counsel prepared for trial, intending to "make the State prove the case beyond a reasonable doubt." Regarding witnesses, trial counsel stated he did not have any to mitigate the State's proof. He recalled one witness he considered calling at trial, but ultimately "determined that that individual might be more damaging than helpful." Trial counsel stated Ms. Humphrey interviewed Ms. Bloodworth and learned of the substance of her testimony prior to trial. He assumed Ms. Humphrey also interviewed Ms. Bloodworth's fiancé but could not recall, noting "if he would have had anything to offer that would have been helpful we would have called him." Trial counsel stated the victim "tried to help [the defendant] out on cross-examination as much as she could" by stating "they were pushing each other back and forth and she really felt like the bruises that she got on her chest was when he inadvertently fell on top of her, um, that he wasn't try[ing] to hurt her and that she never felt kidnapped." The jury, however, "just didn't buy it."

Trial counsel could not recall the victim's testimony regarding the defendant's intoxication level on the night of the crimes. He was aware kidnapping is a specific intent crime but was unaware of intoxication as a complete defense to the same. Rather, trial counsel explained, "I read a case that suggested that [intoxication] can mitigate intent. It can be used for mitigation purposes at a sentencing hearing, but I don't recall them ever saying that it was an absolute defense to every specific intent crime."

Trial counsel believed he discussed the defendant's mental health with him during their first meeting during which the defendant stated he "had some involvement with Mental Health Co-op right after [he] was stabbed, but [he was] fine now." Trial counsel did not investigate the defendant's mental health further as he "got the impression from the way [the defendant] said, what he said and the way he said it, that he hadn't had any recent mental health interaction with anybody." Trial counsel could not recall what medication, if any, the defendant was taking at the time of the crimes. Trial counsel "had a feeling that [the defendant] was probably a heavy drinker" but was unaware of any drug abuse.

When asked about the State's alleged mischaracterization of Ms. Bloodworth's testimony during closing argument, trial counsel stated he did not recall the same. Regardless, trial counsel did not believe the State's alleged mischaracterization warranted an objection, noting:

> I personally wouldn't, I wouldn't necessarily object if that was the only mistake that were made given the level of proof in this case, um, I don't think that "terrorized" instead of "real shaken up" made any impact on the jury. The, you know, the general rule is [the jury] heard what was said. The [j]udge tells them that statements of counsel is (sic) not evidence. It is meant as a guide. If their statements conflict with anything that you heard on the stand go with what you heard on the stand, so I rarely object during a final argument unless it is something pretty, pretty profound.

Strategically, trial counsel chose not to present a closing argument in order to "cut[] off rebuttal by the State." Trial counsel did not want the defendant's recorded jail phone calls with the victim, wherein he implicitly encouraged her to recant her prior statements, to be entered into evidence during trial.

During cross-examination, trial counsel described the defendant as "extremely stubborn and head strong but he gave me no indication that he had any mental health problems." Trial counsel was not concerned about the defendant's mental capacity to make decisions, and he believed the defendant understood the State's offer and why trial counsel encouraged him to take the plea deal. Trial counsel noted the defendant faced a substantial amount of jail time if convicted based upon the applicable sentencing ranges he faced.

Further, regarding strategy, trial counsel attempted to show the defendant did not commit a kidnapping because he did not leave the motel room. Trial counsel also stated he used the victim as a defense witness despite her being called by the State noting, "I believe she put on [the defendant's] position through her cross-examination." In addition, trial counsel explained the defendant did not indicate he was intoxicated during the crimes and never mentioned he suffered from PTSD. Rather, the defendant "explain[ed] each movement" he made in the motel room and "went into . . . almost blow-by-blow explanations as to what happened and why he did it."

Trial counsel did not recall if the defendant requested a bench trial, but stated:

> I can tell you if had (sic) given the facts that we had in this case I would have argued exactly what you just asked him on cross-examination. I would have implored him that his luck was a whole lot better with 12 lay

people hearing these facts and then being charged with the law as opposed to a [j]udge, who at that time the [j]udge had nearly 40 years' experience on the bench and I just felt like a [j]udge, just as soon as the arguments were over the verdict would have been instantaneous.

Finally, trial counsel described Ms. Humphrey as "one of the most thorough investigators that [he] [has] ever used." Trial counsel believed she carefully investigated the defendant's case and noted one of Ms. Humphrey's reports indicated the victim mentioned the defendant failed to take his medications on February 2, 2016. Trial counsel, however, did not investigate the medications further.

At the conclusion of the hearing, the trial court took the motion for new trial under advisement before ultimately denying it. This timely appeal followed.

*Analysis*

The defendant appeals the trial court's denial of his motion for new trial wherein he alleged he received ineffective assistance of counsel and challenged the State's closing argument. Based upon the substance of the defendant's claims against trial counsel, we review the trial court's denial of the motion as we would a post-conviction court's denial of a post-conviction petition. Separately, we address the merits of the defendant's challenge to the State's closing argument.

I.    Ineffective Assistance of Counsel

The defendant generally argues trial counsel failed to investigate and pursue factual data to aid in his defense and failed to effectively highlight the mental state of the defendant at the time of the crimes. The defendant bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the defendant's post-conviction allegations *de novo*, affording a presumption of correctness only to the trial court's findings of fact. *See id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the defendant must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a claim of ineffective assistance of counsel to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A defendant proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the defendant shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Furthermore, when a defendant contends trial counsel failed to discover, interview, or present witnesses in support of his defense, the defendant must call those witnesses to testify at an evidentiary hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This is the only way the defendant can establish that:

- 11 -

(a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of [defendant].

*Id.* Even if a defendant is able to show counsel was deficient in the investigation of the facts or the calling of a known witness, the defendant is not entitled to relief unless he produces a material witness at his evidentiary hearing who "could have been found by a reasonable investigation" and "would have testified favorably in support of his defense if called." *Id.* at 758. Without doing this, the defendant cannot establish the prejudice requirement of the two-prong *Strickland* test. *Id.*

Here, the defendant claims trial counsel did not adequately investigate or defend his case for a myriad of reasons, none of which were supported by proof at the hearing. The defendant initially asserts trial counsel did not effectively challenge witness testimony regarding the time of the events in question. The defendant suggests trial counsel should have presented "the dispatch call logs from the police department" and "the motel records" in order to "narrow[] the time that the victim testified she was held inside the motel room." However, the defendant failed to present the proposed evidence to support this claim at the hearing and failed to offer any additional proof in this regard. Accordingly, he is not entitled to relief as to this issue. *Strickland*, 466 U.S. at 687.

The defendant next suggests trial counsel was ineffective for failing to investigate any witnesses and for failing to interview Ms. Bloodworth's fiancé or the defendant's family, including his brother. At the hearing, trial counsel testified he used Ms. Humphrey, "one of the most thorough investigators that [he] [has] ever used," to investigate the defendant's case and aid the defense team. The trial court determined trial counsel "was aware of the time necessary to prepare this case and utilized resources to interview witnesses in preparation for the trial." We agree. This Court will not reweigh the credibility determinations of the trial court, nor will it second guess the tactical and strategic decisions of trial counsel made after adequate trial preparation. *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). Further, the defendant failed to call Ms. Bloodworth's fiancé, his brother, or any other family members to testify on his behalf at the hearing. As such, the defendant cannot show he was prejudiced by trial counsel's alleged failure to interview or call Ms. Bloodworth's fiancé or members of his family to testify at trial. The defendant is not entitled to relief as to this issue. *Black*, 794 S.W.2d at 758.

The defendant also argues trial counsel failed to challenge the victim's mental state at the time of the crimes to demonstrate the defendant was not guilty of aggravated kidnapping. Specifically, the defendant alleges trial counsel failed to elicit testimony from the victim that "she was afraid due to the circumstances at the exact moment of the inciden[t] but not so afraid that she didn't view [the defendant] as a source of terror." Further, the defendant asserts trial counsel failed to adequately highlight the victim's statement, that portions of her injuries might have resulted from the defendant attempting to prevent her from falling rather than from the defendant unlawfully detaining her, to support a conviction of false imprisonment rather than aggravated kidnapping. We disagree. At the hearing, trial counsel explained he utilized the victim as a defense witness and believed she "put on [the defendant's] position through her cross-examination." Nothing in the record suggests trial counsel's strategy regarding the handling of the victim at trial was deficient, and the defendant cannot show prejudice as a result. Again, this Court will not second guess the tactical and strategic decisions of trial counsel made after adequate trial preparation. *Henley*, 960 S.W.2d at 579.

Similarly, the defendant asserts trial counsel was ineffective for failing to argue the defendant's actions were meant only "to calm [the victim] down," not to injure the victim. However, as noted above, trial counsel highlighted the defendant's position while cross-examining the victim at trial. In doing so, the victim testified she did not think the defendant was trying to kidnap her or obstruct her airway on the night in question and further stated she believed some of her injuries occurred when the defendant tried to stop her from falling. The record indicates trial counsel effectively cross-examined the victim during which she corroborated the defendant's position, and he cannot show prejudice as a result. *Id.* The defendant is not entitled to relief.

The defendant also argues trial counsel was ineffective for failing to pursue a defense of voluntary intoxication or to request a jury instruction "providing that kidnapping is a specific intent crime" after the victim alleged the defendant had been drinking prior to the incident. The trial court found:

> While there was testimony that the [d]efendant had a history of drug or alcohol abuse, there was no testimony at this hearing that information was conveyed to [trial counsel] that the [d]efendant was under the influence of a drug or intoxicant at the time of the offense. There was testimony at trial that the [d]efendant consumed alcohol prior to the events involving the victim. However, there was no testimony regarding the [d]efendant's level of intoxication.

Rather, at the hearing, trial counsel testified the defendant did not suggest he was intoxicated during the crimes and instead, the defendant provided a near "blow by blow"

- 13 -

description of his actions in the motel room. The defendant cannot show he was prejudiced by trial counsel's failure to pursue a defense of intoxication as nothing in the record suggests it was warranted at trial. *See Strickland*, 466 U.S. at 689; *Goad* 938 S.W.2d at 369. The defendant is not entitled to relief.

Regarding the jury instruction on intoxication, the trial court held:

In this case, the evidence was that defendant consumed alcohol with his brother. There was no evidence regarding the level of intoxication that would have warranted a request for a jury instruction on intoxication. The [c]ourt is of the opinion that [trial counsel] had no basis to request a jury instruction on intoxication. Therefore, the [c]ourt does not find that [trial counsel] was ineffective as it relates to this issue.

Again, we agree. The defendant has failed to provide evidence to support his argument, and he is not entitled to relief as a result. *Id.*

Similarly, the defendant asserts trial counsel was ineffective for failing to investigate the defendant's mental health at the time of the crimes as they "were relevant and should have been investigated to insure (sic) that [the defendant] could have formed the requisite intent to even commit the crimes alleged." The trial court determined trial counsel properly investigated the defendant's mental health, noting trial counsel "was of the belief that, at the time of trial, the [d]efendant was not suffering from any mental health deficiencies." At the hearing, trial counsel explained though he learned the defendant had visited the Mental Health Co-op in the past, he did not believe the defendant was suffering from any mental health issues prior to trial. Trial counsel believed the defendant understood the charges he faced and the plea deal offered, but the defendant simply insisted on going to trial. The defendant has failed to provide any evidence to demonstrate he was suffering from mental health issues, either at the time of the crimes or trial, and he is not entitled to relief. *Id.*

II. Closing Argument

The defendant argues the State made an improper closing argument by allegedly mischaracterizing Ms. Bloodworth's testimony. We review this claim under the plain error doctrine as the defendant failed to object to the same at trial. It is well established that "when necessary to do substantial justice," this Court may "consider an error that has affected the substantial rights of a party" under plain error analysis. Tenn. R. App. P. 36 (b); see also *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the

fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). The following five factors must be met for plain error relief to be granted: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id*. at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopted the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this Court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Here, the defendant cannot meet the minimum requirements to warrant plain error review. The defendant asserts the State mischaracterized Ms. Bloodworth's testimony by stating "that Ms. Bloodworth testified that the victim was 'terrorized' by the actions of the defendant." Our review of the record, however, reveals the State described Ms. Bloodworth's testimony, as follows: "You heard from Ms. Bloodworth this morning who saw [the victim] moments after, *she said she was terrified*. She noticed the marks on her body and on her chest, the signs of bodily injury." Accordingly, we find the defendant's argument misplaced as the State did not use the term "terrorized" in its closing argument and as a result, the record does not clearly establish what occurred in the trial court as alleged by the defendant and required for plain error review. *Id.* at 282-83. The defendant is not entitled to relief.

Further, we note, the State properly summarized Ms. Bloodworth's testimony by characterizing the victim as "terrified" upon entering Ms. Bloodworth's motel room. Ms. Bloodworth testified she and her fiancé woke up to a car alarm sounding and the victim screaming their names as the victim sought refuge from the defendant. The victim was "upset, crying, [and] nervous" with "bruising all over her chest area" as she entered Ms. Bloodworth's motel room. When asked if the victim seemed scared, Ms. Bloodworth stated, "Yes. Nervous." Therefore, the State's use of the term "terrified" in summarizing Ms. Bloodworth's description of the victim is supported by ample evidence in the record. Again, not only is the defendant's argument misplaced, as our review of the record does not reveal any mischaracterization by the State, but also he cannot establish plain error review is warranted as nothing in the record suggests a clear and unequivocal rule of law was breached, a substantial right of the accused was adversely affected, or consideration of the issue is necessary to do substantial justice. *Id.* The defendant is not entitled to relief.

### *Conclusion*

- 15 -

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE